**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| MIGDALIA BONILLA, | : | |
| Plaintiff | : | CIVIL CASE NO. |
| | : | 3:17-CV-212(JCH) |
| v. | : | |
| | : | |
| UNITED STATES OF AMERICA, | : | MARCH 22, 2019 |
| Defendant. | : | |

**RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (DOC. NOS. 29 & 30)**

The plaintiff, Migdalia Bonilla ("Ms. Bonilla") brings this action, pursuant to section 7422 of title 26 of the United States Code, seeking recovery of federal income taxes and related interests and penalties, against the defendant, the United States of America. Complaint ("Compl.") (Doc. No. 1) at 1. Before this court are the parties' Cross-Motions for Summary Judgment. See Bonilla's Motion for Summary Judgment (Doc. No. 29) ("Bonilla Mot. Summ. J."); United States of America's Motion for Summary Judgment (Doc. No. 30) ("U.S. Mot. Summ. J.").

For the reasons stated below, Ms. Bonilla's Motion for Summary Judgment (Doc. No. 29) is **denied**, and the United States of America's Motion for Summary Judgment (Doc. No. 30) is **granted**.

## I. STANDARD OF REVIEW

On a motion for summary judgment, the moving party bears the burden of establishing the absence of any genuine issue of material fact. Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010). If the moving party satisfies that burden, the nonmoving party must set forth specific facts demonstrating that there is a genuine issue for trial. Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). A genuine issue exists where the evidence is such that a reasonable jury could decide in

1

the nonmoving party's favor.  See, e.g., Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 104 (2d Cir. 2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, (1986)).

The court's role at summary judgment "is to determine whether genuine issues of material fact exist for trial, not to make findings of fact."  O'Hara v. Nat. Union Fire Ins. Co. of Pittsburgh, 642 F.3d 110, 116 (2d Cir. 2011).  Unsupported allegations do not create a material issue of fact and cannot overcome a properly supported motion for summary judgment.  See Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000). Additionally, the evidence the court considers in ruling on a motion for summary judgment must be admissible evidence, or evidence that could be readily reduced to an admissible form at trial.  See LaSalle Bank National Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 205 (2d Cir. 2005); Santos v. Murdock, 243 F.3d 681, 683 (2d Cir. 2001) ("Affidavits submitted to defeat summary judgment must be admissible themselves or must contain evidence that will be presented in an admissible form at trial.") (citation omitted).  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249–50 (1986).

When, as here, both parties come before the court on cross-motions for summary judgment, the court is not required to grant judgment as a matter of law for either side.  See Ricci v. DeStafano, 530 F.3d 88, 109–10 (2d Cir. 2008).  "Rather the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Id. at 110.

## II.    FACTS[1]

Ms. Bonilla was married to Robert Bonilla ("Mr. Bonilla") in 1986.  United States'
Local Rule 56(a)2 Statement of Facts in Opposition to Summary Judgment (Doc. No.
38-1) ("U.S. Opp. Facts") ¶ 1.  Mr. Bonilla was a professional baseball player.  Id. ¶ 2.
On February 23, 1994, Mr. Bonilla incorporated Bobby Bo Investments, Inc. ("BBI"), a
Florida for-profit corporation.  Id. ¶ 3.  Mr. Bonilla created BBI to hold investments for
him; he chose the name BBI because people called him "Bobby Bo" when he played
baseball.  Id. ¶ 4.  As of February 23, 1994, Mr. Bonilla was the sole shareholder,
officer, director, and president of BBI; Mr. Bonilla was President of BBI in 1994.  Id. ¶ 6.
According to a website for the State of Florida Division of Corporations, BBI was
administratively dissolved on August 25, 1995.  Id. ¶ 8.  At that time, Mr. Bonilla was the
sole shareholder, director, and officer of BBI.  Id. ¶ 9.  There is no record on the Florida
government website of BBI being reinstated since August 25, 1995.  Id. ¶ 10.

Ms. Bonilla and Mr. Bonilla were divorced on May 22, 2009, pursuant to the
Memorandum of Decision of the Connecticut Superior Court ("2009 Divorce Decree").
Id. ¶ 11.  As part of the 2009 Divorce Decree, the Court ordered that ownership of
certain companies, including BBI, "shall be divided equally" between Mr. Bonilla and Ms.
Bonilla within 30 days.  Id. ¶ 12.  On April 28, 2010, Ms. Bonilla filed a Motion for
Contempt, stating that "[no] division of these assets has occurred."  Id. ¶ 13.  At a
hearing in May 2010, Mr. Bonilla's counsel represented to the court that Mr. Bonilla was

---

[1] For the purposes of this section, undisputed facts will be cited to the United States of America's
Local Rule 56(a)(2) Statement in Opposition to Ms. Bonilla's Motion for Summary Judgment (Doc. No. 38-
1), and Ms. Bonilla's Local Rule 56(a)(2) Statement in Opposition to the United States of America's
Motion for Summary Judgment (Doc. No. 37-1).

willing to give Ms. Bonilla all of the companies "other than Bobbie Bo Investment which is his name," and made other references as to Mr. Bonilla wanting to keep BBI. Id. ¶ 16. Mr. Bonilla also filed a Motion to Amend the 2009 Divorce Decree requesting, inter alia, to keep BBI. Id. ¶ 17.

On December 14, 2010, the Superior Court held a hearing in the divorce proceedings ("December 2010 Hearing"). Id. ¶ 20. Between the May 2010 Hearing and the December 2010 Hearing, no physical shares or securities of BBI were transferred to Ms. Bonilla. Id. ¶ 19. At the December 2010 Hearing, the parties agreed that Ms. Bonilla "will actually be the owner" and "will have ownership" of BBI. Bonilla Local Rule 56(a)2 Statement of Facts in Opposition to Summary Judgment (Doc. No. 37-1) ("Bonilla Opp. Facts") at 2 ¶ 6. The parties agreed that Ms. Bonilla and her attorney would bear the burden of effectuating the transfer of interests. Id. at 3 ¶ 7. At the conclusion of the December 2010 Hearing, the court so ordered the proceedings, stating, "I'll sign the transcript. And that'll be the order of the court. . . . But for now, so ordered." Id. at 3 ¶ 9.

Financial affidavits filed by Mr. Bonilla in the divorce proceedings noted that BBI held his interest in Performance Imaging. Id. at 5 ¶ 14. BBI contributed money to Performance Imaging, but the contributions were made from Mr. Bonilla's personal income. Id. at 6 ¶ 18. Performance Imaging was formed in 1996, after BBI had been administratively dissolved. Id. at 4 ¶ 12. The initial investment in Performance Imaging was $100,000. Id. at 5 ¶16. BBI has not made any contributions to Performance Imaging since 2000. Id. at 6 ¶20. Since 2000, other than sending documents, including Schedules K-1 ("K-1s") to Performance Imaging's investor members and

communications regarding the K-1s, there has been no communication between Performance Imaging and its investor members. Id. at 7 ¶ 23. Performance Imaging has never made income distributions to its members, nor has it covered members' tax costs. Id. at 8 ¶¶ 28–29. Performance Imaging's financial documents list BBI's share of Performance Imaging's profit, lost, and capital as 69.51 percent. Id. at 10 ¶ 42.

During the 2010 and 2011 tax years, BBI was an S Corporation. Id. at 10 ¶ 39.[2] BBI did not file any tax return for the 2009, 2019, and 2011 tax years. Id. at 10 ¶ 37. Ms. Bonilla was provided with Performance Imaging's Schedule K-1 for BBI for the 2009 tax year, by email, on September 16, 2010. Id. at 11 ¶ 44. On September 30, 2011, Ms. Bonilla's attorney sent Performance Imaging a copy of the Divorce Decree and a transcript of the December 2010 Hearing. Id. at 11 ¶ 45. In response to a request from Performance Imaging for "the address for [BBI] for Ms. Bonilla" to which to send Performance Imaging's 2010 tax return, Ms. Bonilla's attorney provided Performance Imaging with Ms. Bonilla's address. Id. at 12–13 ¶ 49. Performance Imaging's K-1s for BBI for the tax years 2010 through 2016 list BBI's address as Ms. Bonilla's residence. Id. at 13 ¶ 51. Ms. Bonilla forwarded the K-1s to her accountant. Id. at 13 ¶ 52.

Performance Imaging's K-1s for BBI for the 2010 and 2011 tax years reported that BBI's share of business income was $908,871 and $61,112, respectively. Id. at 15 ¶ 57. The IRS concluded that Performance Imaging's ordinary business income in 2010

---

[2] Ms. Bonilla denies this, see Bonilla Opp. Facts (Doc. 37-1) at 10 ¶ 39, and other statements of fact presented by the government. However, where, as here, Ms. Bonilla fails to provide evidence to support her denials of properly supported statements of fact, the court deems the statements admitted. See D. Conn. L. Civ. R. 56(a)3 ("[E]ach denial in an opponent's Local Rule 56(a)2 Statement, must be followed by a specific citation to . . . evidence that would be admissible at trial. . . . Failure to provide specific citations to evidence . . . may result in the Court deeming admitted certain facts that are supported by the evidence.")

and 2011 was $1,122,706 and $79,294, respectively.  Id. at 15 ¶ 58.  Ms. Bonilla did not report any portion of BBI's share of Performance Imaging's income on her 2010 and 2011 tax returns.  Id. at 15 ¶ 59.  After a tax examination of Performance Imaging, the IRS increased Ms. Bonilla's ordinary income for the 2010 and 2011 tax years by $780,393 and $55,117, respectively, equal to 69.51% of Performance Imaging's corrected 2010 and 2011 ordinary business income.  Id. at 15 ¶ 59.  The IRS assessed taxes against Ms. Bonilla for the 2010 and 2011 tax years of $235,783 and $19,291, respectively.  Id. at 15–16 ¶¶ 60–61.  Including fees and penalties, the IRS claimed that Ms. Bonilla owed the IRS $323,164.42 for the 2010 tax year, and $21,871.74 for the 2011 tax year.  See U.S. Opp. Facts ¶¶ 87, 90.

Ms. Bonilla paid the full amounts claimed by the IRS, on April 11, 2016.  Id. ¶ 92. She filed a refund claim with the IRS on the same date.  Id. ¶ 93.  The IRS denied the administrative claim on October 3, 2016.  Id. ¶ 94.  The government conceded, on April 4, 2018, that $372,023 of the $780,393 increase to Ms. Bonilla's income for the 2010 tax year was incorrect, and directed the IRS to partially abate the tax, penalties, and fees levied against Ms. Bonilla.  Id. ¶ 95.  The IRS conceded that Ms. Bonilla was entitled to a partial credit to her 2010 tax liability, but no credit to her 2011 tax liability. Id. ¶¶ 95–98.

On March 8, 2019, the court heard oral argument on the pending Motions for Summary Judgment.

## III.    DISCUSSION

### A.    Variance Doctrine

As an initial matter, the government argues that this court is without jurisdiction to hear certain of Ms. Bonilla's arguments.  Under the variance doctrine, codified at section 7422 of title 26 of the United States Code and its accompanying regulations, a taxpayer bringing suit under section 7422 "may not raise different grounds than those brought to the IRS" in the prior administrative refund claim.  <u>Magnone v. United States</u>, 902 F.2d 192, 193 (2d Cir. 1990).[3]  "The taxpayer . . . need only set forth facts in the claim sufficient to enable the IRS to make an intelligent review of the claim.  However, the grounds for the refund must be at least impliedly contained in the application for refund." <u>Carione v. United States</u>, 291 F. Supp. 2d 141, 146 (E.D.N.Y. 2003) (citing <u>303 West 42nd St. Enterprises, Inc. v. I.R.S.</u>, 181 F.3d 272, 278 (2d Cir.1999) and <u>Burlington Northern Inc. v. United States</u>, 231 Ct.Cl. 222, 684 F.2d 866, 868 (1982)) (quotation marks omitted).

In the government's view, the "variance doctrine" precludes this court's review of Ms. Bonilla's arguments that (1) BBI could not have acquired an interest in Performance Imaging because BBI had been administratively dissolved; and (2) that the December

---

[3] Section 7422(a) provides that:

No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the Secretary, according to the provisions of law in that regard, and the regulations of the Secretary established in pursuance thereof.

26 U.S.C. § 7422(a).

2010 divorce hearing was an unenforceable "agreement to agree."  See United States'
Response in Opposition (Doc. No. 38) ("USA Reply in Opp.") at 6.  The government
argues that Ms. Bonilla failed to sufficiently set forth these arguments in her
administrative claim for refund.  Id.

Ms. Bonilla argues in response that (1) the government's reading of the variance
doctrine is "overly narrow and restrictive," and (2) her arguments in her administrative
claim were "[a]t the very least . . . facts sufficient to enable the IRS to make an
intelligent administrative review" into BBI's corporate status and whether "under any
legal theory or grounds," Ms. Bonilla owned BBI in 2010 and 2011.  Bonilla Reply in
Support of Plaintiff's Motion for Summary Judgment ("Bonilla Reply in Supp.") (Doc. No.
42) at 5.

In her Administrative Claim, Ms. Bonilla argued that, irrespective of the 2010
Divorce Decree, Mr. Bonilla had "failed to provide [Ms. Bonilla] with a stock certificate
transferring his shares in [BBI] . . . or other corporate documents regarding the business
or effecting the transfer of his ownership interests in the business to [Ms. Bonilla]."
Govt. Exhibit 38, Administrative Claim for Refund (Doc. No. 38-10) ("Admin. Claim")
at 1.  Ms. Bonilla also noted in the Administrative Claim that, a Florida corporation with
the same name as BBI was dissolved on August 25, 1995, and that interests in a
dissolved corporation "were not effectively transferred to [Ms. Bonilla] . . . in December
2010.  Id.  Ms. Bonilla added that her alleged tax liability arose from the separate IRS
audit of "Performance Imaging, LLC[,] which [BBI] appears to own an interest in."  Id. at
1–2.  Finally, Ms. Bonilla stated that her disagreement with her purported tax liability
was focused on "a non-partnership item that was beyond the scope of the TEFRA audit

of Performance Imaging, LLC – that being the ownership of [BBI]" and the "clearly erroneous assertion that [Ms. Bonilla] owned [BBI] during the years at issue." Id. at 2.

Ms. Bonilla's Administrative Claim was therefore focused on three related issues: (1) whether the divorce proceedings involving her and Mr. Bonilla transferred the ownership of BBI between Mr. Bonilla and Ms. Bonilla; (2) whether Ms. Bonilla was the owner of BBI during the 2010 and 2011 tax years; and (3) whether the IRS acted beyond the scope of the TEFRA audit of Performance Imaging when it determined that Ms. Bonilla was BBI's owner. See id. at 1–2.

In her Administrative Claim, Ms. Bonilla specifically noted that she was contesting the IRS' determination that she was the owner of BBI, and that she was not contesting issues related to the audit of Performance Imaging. Id. at 2. While Ms. Bonilla did refer to BBI's apparent dissolution, it was mentioned in support of an argument that BBI's shares could not have been transferred to her. The Administrative Claim made no mention of BBI's ability to obtain an ownership interest in other companies. Indeed, the only reference to BBI's ownership interest in Performance Imaging was to state that BBI "appears to own an interest" in Performance Imaging. The court concludes that Ms. Bonilla's argument—that the administrative dissolution of BBI barred it from holding an interest in Performance Imaging—was neither "expressly or impliedly contained in the application for refund." Burlington N., Inc. v. United States, 684 F.2d 866, 868 (Ct. Cl. 1982). The court is therefore without jurisdiction to rule on the merits of that argument.

As to whether the Court Order in the divorce proceedings was an unenforceable "agreement to agree," Ms. Bonilla did not expressly make such an argument using that

term in her Administrative Claim.  However, she noted her view that the divorce

proceedings were insufficient to transfer ownership over BBI between Mr. Bonilla and

herself.  Admin. Claim at 1.  Whether an effective transfer of ownership took place was

a focus of the Administrative Claim, and Ms. Bonilla made clear to the IRS her

disagreement with its finding that she was an owner pursuant to the divorce

proceedings.  Id. at 4 (noting that the earliest possible date Ms. Bonilla could be an

owner would be a year after the hearing, when the Order was signed).  The court

concludes that Ms. Bonilla's argument here—that the Divorce Decree issued in

connection with the divorce proceedings resulted in an unenforceable agreement to

agree—was not a substantial variance from the arguments raised in the Administrative

Claim.  The court therefore has jurisdiction to address Ms. Bonilla's latter argument.

      B.    <u>Agreement to Agree</u>

Ms. Bonilla argues that the Connecticut divorce proceedings resulted in an

unenforceable agreement to agree.  Bonilla Memorandum in Opposition to Motion for

Summary Judgment ("Bonilla Mem. in Opp") (Doc. No. 37) at 11; Bonilla Memorandum

in Support of Motion for Summary Judgment ("Bonilla Mem. in Supp.") (Doc. No. 29-1)

at 25.   Ms. Bonilla argues that the May 2009 Divorce Decree did not transfer ownership

of BBI to Ms. Bonilla, but rather, "ordered that BBI be divided equally by the parties

within thirty days."  Bonilla Mem. in Opp. at 11.  Therefore, Ms. Bonilla argues, the

Decree "required future action to consummate the transfer" and was prospective.  Id.

Ms. Bonilla similarly argues that the December 2010 Hearing did not have the

legal effect of transferring ownership of BBI.  Id.  In Ms. Bonilla's view, because the

parties agreed that the transfer of BBI shares from Mr. Bonilla to Ms. Bonilla "would

eventually be memorialized in a written document executed by Mr. Bonilla," the stipulated agreement stated on the record at the divorce proceedings was an unenforceable agreement to agree.  Bonilla Mem. in Supp. at 28.

As to Ms. Bonilla's first argument, the court notes that the 2009 Divorce Decree was meant to, and in fact did, dissolve Mr. Bonilla and Ms. Bonilla's marriage.  See May 2009 Divorce Decree (Doc. No. 31-1) at 9.  Moreover, the Decree was worded to resolve all outstanding marital contentions, including: (1) legal custody of a minor child, see id. at 9; (2) child support and alimony, id. at 9–11; (3) the distribution of real property, id. at 11–14; and (4) the distribution of private property, including ordering the equal division of BBI within 30 days of the decree, id. at 15.  Even if the May 2009 Divorce Decree contemplated future action as to this final category, and therefore did not transfer legal title immediately upon its entry, the state court clearly ordered that such transfer take place within 30 days.  The Decree therefore created a legally enforceable right to such transfer within that period, and a party's failure to abide by the Decree was subject to a finding of contempt.  See Legnos v. Legnos, 70 Conn. App. 349, 354 (2002) (holding that trial court properly exercised its discretion in finding party to divorce in contempt where the defendant "willfully failed to meet his obligations under the dissolution decree"); Lawrence v. Cords, 165 Conn. App. 473, 482–83 (2016) (noting court's authority under Conn. Gen. Stat. 46b-81, to transfer property).  That Ms. Bonilla filed a Motion for Contempt following the 2009 Divorce Decree alleging, inter alia, that Mr. Bonilla had failed to transfer his interest in BBI, is undisputed evidence of her understanding that she had a right to have the court's judgment enforced.

As to Ms. Bonilla's argument that the December 2010 Hearing resulted in an agreement to agree, the agreement she references was made on the record, before a state court Judge, as a stipulated agreement to bring divorce proceedings to a close. <u>See</u> Govt. Ex. 2 (Doc. No. 31-2) ("Dec. 2010 Tr.") at 9:7–10[4] ("[W]hen we finish this stipulation[,] assuming that the parties have agreed to the stipulation[,] then these motions are done once and for all. They're finished.") As part of the stipulation offered to resolve the pending motions, the parties noted that that they "agreed that [Ms.] Bonilla will have ownership" over all of the disputed LLCs, including BBI. <u>See id.</u> at 13:6. The parties further noted that, "the burden of . . . effectuating the transfer of Mr. Bonilla's interests in these entities to Ms. Bonilla will be hers and her attorneys[']." <u>Id.</u> at 13:16. At the conclusion of the hearing, the Court asked Mr. Bonilla and Ms. Bonilla whether they were freely entering into the stipulation, and whether they understood that the agreement resolved all outstanding issues in the divorce proceedings. <u>See id.</u> at 25:3–26:13. The court thereafter approved the agreement on the record, <u>id.</u> at 26:12, and noted that, once the Judge signed the transcript, "that'll be the order of the court." <u>Id.</u> at 26:20.

The Connecticut Appellate Court addressed a similar issue in <u>Puff v. Puff</u>, 177 Conn. App. 103 (2017), <u>pet. for cert. denied</u>, 327 Conn. 994 (2018). Before the trial court, the parties, in connection with a motion for modification of alimony, reached a stipulated oral agreement. <u>Id.</u> at 107. The Court, after inquiring of the parties as to whether they understood the terms of the agreement, found it to be fair and equitable,

_____

[4] For ease of reference, when citing to the transcript of the December 2010 Hearing, the court cites to the page and line numbers noted in the original transcript, not the page number imposed by the electronic filing system.

and approved the agreement.  Id.  The plaintiff later argued that the oral statements were not sufficient to form a binding agreement.  The trial court disagreed, and the plaintiff appealed.  Id. at 110.  Denying the plaintiff's appeal, the Appellate Court noted the following general principles:

> A stipulated judgment constitutes a contract of the parties acknowledged in open court and ordered to be recorded by a court of competent jurisdiction. . . . A stipulated judgment allows the parties to avoid litigation by entering into an agreement that will settle their differences once the court renders judgment on the basis of the agreement. . . . A stipulated judgment, although obtained through mutual consent of the parties, is binding to the same degree as a judgment obtained through litigation . . . .

Id. at 110–11.  The Appellate Court added that it could find that, "no intent contrary to the creation of an enforceable order was expressed at the . . . hearing," and that "[b]oth parties expressed the intent to resolve the matter [on the date of the hearing], and sought to have the court approve the agreement as an enforceable order."  Id. at 116.

This court is faced with a similar set of facts.  As in Puff, the parties in this case stated to the judge that their stipulation was intended to address all pending divorce matters, including the dispute over the ownership of BBI.  See Dec. 2010 Tr. at 8:23–9:04 ("Your Honor, the intention of the parties is that this stipulation will resolve . . . all of these motions. . . . [I]f, for example, there was an issue raised in one of the motions but we haven't addressed it, that's because it's part of this global settlement.").  Moreover, the Superior Court made clear to the parties that the transcript of the proceedings would be signed and would become the order of the Court; neither of the parties objected to this.  Id. at 26:20–26:27 ("The Court: [W]e'll order a transcript and I will sign the transcript.  And that'll be the order of the Court.  Atty. Mattei: Thank you, Your Honor.  Atty. King: Thank you, Judge.")

13

Ms. Bonilla has failed to put forward sufficient evidence upon which a jury could conclude that the stipulated agreement presented in the December 2010 divorce proceedings was an unenforceable "agreement to agree." There is no genuine issue of material fact as to whether the parties intended to enter into an agreement to resolve all outstanding divorce issues, including ownership of BBI, that the Court approved the stipulation, and that the stipulation thereafter became an Order of the Court. At that point, the Stipulated Order was "binding to the same degree as a judgment obtained through litigation." Puff, 177 Conn. App. at 111. Ms. Bonilla may not, in effect, modify the Stipulated Order, or question its binding effect, especially where she failed to follow through with her obligations under the stipulation.

C.  Statutory Notice of Deficiency

Ms. Bonilla also argues that summary judgment in her favor is warranted because the IRS improperly determined her ownership interest in BBI without first issuing the statutory notice of deficiency required by law. See Bonilla Mem. in Supp. at 15. Ms. Bonilla argues that, by failing to afford her proper notice of her alleged tax liability, the IRS "precluded Ms. Bonilla from appealing those claimed deficiencies to the Tax Court." Id. Ms. Bonilla argues that section 7422 of title 26 "nowhere provides that a taxpayer may file for an injunction." Bonilla Reply in Supp. at 4. In fact, Ms. Bonilla argues, section 7421 of the same title "expressly prohibits a party from filing an injunction . . . ." Id.

Assuming that Ms. Bonilla was entitled to receive a statutory notice of deficiency and assuming that, by failing to provide her such notice, the IRS improperly assessed Ms. Bonilla's tax liability, this argument is unavailing. Section 6213 of title 26 of the

United States Code provides that, "no assessment of a deficiency in respect of any tax

. . . shall be made, begun, or prosecuted until [a notice of deficiency] has been mailed to

the taxpayer." 26 U.S.C. § 6213. If a deficiency assessment is made prior to the

mailing of such notice, the statute explicitly states that, "[n]otwithstanding the provisions

of section 7421(a)" any proceedings related to that assessment "may be enjoined by a

proceeding in the proper court, including the Tax Court." Id.

The statute therefore provides taxpayers like Ms. Bonilla, who allege insufficient

notice, an appropriate pre-payment remedy against "any proceedings" related to an

assessment made without requisite notice: injunctive relief. However, once a taxpayer

has paid the amount sought by the government and pursues "an action for the recovery

of federal income taxes," see Compl. ¶ 1, she has a cause of action to recover the

overpayment, in which the burden of proof is on the plaintiff-taxpayer to show that she

has overpaid her tax. See Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2d.

Cir. 1993); see also Lewis v. Reynolds, 284 U.S. 281, 283, modified, 284 U.S. 599

(1932); Van Antwerp v. United States, 92 F.2d 871, 873 (9th Cir. 1937) (holding that the

burden of proof in a refund suit is on the taxpayer to show she does not owe taxes,

"regardless of the legality of the Commissioner's action in collecting the alleged

deficiency without sending the deficiency notice specified" by statute).

Therefore, as the government argues, the issue before this court is not whether

the IRS followed statutory notice requirements, or whether Ms. Bonilla was entitled to

such notice. See Van Antwerp, 92 F.2d at 873. Ms. Bonilla could properly have raised

those arguments—prior to paying the amount the IRS alleged was owed—by bringing

suit to enjoin the assessment. [5],[6]  The question before this court is limited to the existence of a genuine issue of material fact as to whether Ms. Bonilla overpaid her tax. See U.S. Mem. in Opp. at 9.  Summary judgment for Ms. Bonilla on this basis is therefore denied.

D.    Ownership of BBI

Having determined that (1) there is no genuine issue of material fact as to whether the Stipulated Order constituted an agreement to agree, and (2) the question of notice is not relevant to this suit, the court turns to whether Ms. Bonilla owned BBI for tax purposes in 2010 and 2011.  Ms. Bonilla argues that summary judgment in her favor is appropriate because (1) BBI, as an administratively dissolved corporation, could not transfer its shares to her; (2) Ms. Bonilla was never issued any BBI shares under Florida law or the Uniform Commercial Code ("UCC"); and (3) Ms. Bonilla was not a beneficial owner of BBI in 2010 or 2011.[7]  See Bonilla Mem. in Supp. at 18–24; Bonilla Reply in Supp. at 9–10.  The government argues that summary judgment in its favor is

_____

[5] At oral argument, Ms. Bonilla's counsel argued that the notice of computational adjustment that she received barred her from seeking pre-payment injunctive relief.  Indeed, subsection (b) of section 6213 of title 26 provides that a computational adjustment does not give rise to a right to seek redress in tax court.  See 26 U.S.C. § 6213(b).  But subsection (b) assumes that the computational adjustment received by the taxpayer was the proper form of notice.  As the government argued at oral argument, if the taxpayer should properly have been notified via a statutory notice of deficiency but did not, the government violates subsection (a) by assessing a deficiency without proper notice.  In that situation, a taxpayer could still seek pre-payment enjoinment, under subsection (a), of any collection activity by the IRS.  Ms. Bonilla did not do so here.

[6] The court notes that, while Ms. Bonilla did not receive a statutory notice of deficiency, it is undisputed that "Notices of Beginning of Administrative Proceeding (NBAP) were mailed to Bobby Bo Investments at 2 Glen Road, Greenwich, CT 06830, Ms. Bonilla's residential address, on April 29, 2013, and June 24, 2013, for the 2010 and 2011 tax years, respectively."  See U.S. Reply in Opp. at 3 n.1. However, the government conceded at oral argument that such notice does not constitute a statutory notice of deficiency.

[7] Ms. Bonilla also argues that BBI could not, as a dissolved corporation, attain an interest in Performance Imaging; however, as noted above, see supra at 9, the court is without jurisdiction to reach that argument.

appropriate because, irrespective of whether Ms. Bonilla received legal title to BBI shares, she was a beneficial owner of BBI in 2010 and 2011.  <u>See</u> U.S. Mem. in Supp. at 7.  The court addresses the arguments in turn, mindful that it must "draw all reasonable inferences against the party whose motion is under consideration."  <u>Ricci</u>, 530 F.3d at 10.

### 1.    Transfer of BBI Ownership

Ms. Bonilla argues that, as an administratively dissolved Florida corporation, BBI could not have legally transferred its shares, and therefore that "Ms. Bonilla could not have become, and did not become, BBI's owner."  Bonilla Mem. in Opp. at 19; Bonilla Mem. in Supp. at 20.  Ms. Bonilla provided a certified statement from the Florida Secretary of State, confirming that BBI was administratively dissolved on August 25, 1995.  <u>See</u> Bonilla Reply in Supp., Attach. 1 (Doc. No. 42-1) at 1.  While the government contested in its briefing that Ms. Bonilla has not "conclusively established" that BBI was administratively dissolved, it conceded the issue at oral argument.  It is therefore undisputed that BBI was administratively dissolved as of August 25, 1995.

Ms. Bonilla argues that, under Florida law, an administratively dissolved corporation "may not carry on any business except that necessary to wind up and liquidate its business and affairs."  Fla. Stat. § 607.1421.  Therefore, she argues, transferring its shares "was not a legal act BBI could take."  However, even accepting that BBI could not, of its own accord, transfer its shares to another party, the argument fails to account for the power of a Connecticut court, in a divorce proceeding, to apportion property between spouses.

The Florida Business Corporations Act is clear that, while a dissolved corporation may not carry out business activities unrelated to winding down, it "continues its corporate existence."  Fla. Stat. § 607.1421.  Connecticut law is equally clear that a court, in connection with divorce proceedings, "may assign to either spouse all or any part of the estate of the other spouse."  Conn. Gen. Stat. § 46b-81; see Calo-Turner v. Turner, 83 Conn. App. 53, 61 (2004) ("[A] trial court has extensive discretion regarding financial awards in dissolution actions") (quotation omitted).  It is undisputed that, prior to the divorce proceedings, Mr. Bonilla was the sole owner of BBI.  When the parties' stipulation became an Order of the Court, as a matter of law, it was binding to the same extent as any Order or Judgment of the court.  Puff, 177 Conn. App. at 111.  Because ownership of BBI was transferred between Mr. Bonilla and Ms. Bonilla not by BBI, but by an Order of the Superior Court of Connecticut, whether BBI could transfer its shares is irrelevant, and any disputed issue of fact as to that question is immaterial.  Ms. Bonilla's Motion for Summary Judgment on the basis that BBI could not legally transfer its shares is denied.

### 2.    Florida Business Corporations Act and UCC

Ms. Bonilla argues that she never acquired shares of BBI under the Florida Business Corporations Act ("FBCA"), and therefore was not the owner of BBI in 2010 and 2011.  See Bonilla Mem. in Supp. at 20–22.  The government acknowledges that Ms. Bonilla never acquired legal title to BBI stock during 2010 and 2011.  U.S. Mem. in Opp. at 22.  However, the government argues that, for federal tax purposes, stock ownership is determined by beneficial ownership, not legal title.  Id.  Because the court agrees that beneficial ownership, not legal title, forms the basis for federal tax liability,

see infra at 19, it does not reach Ms. Bonilla's arguments as to the FBCA and the UCC, except to conclude that there is no genuine dispute as to an immaterial fact: that Ms. Bonilla never acquired legal title to BBI stock.

### 3. Beneficial Ownership

An "S corporation" is a small business corporation that has elected S corporation status, pursuant to section 1362 of title 26 of the United States Code. See 26 U.S.C. § 1361. In an S corporation, "[t]he corporation's profits pass through directly to its shareholders on a pro rata basis and are reported on the shareholders' individual tax returns." Gitlitz v. Comm'r, 531 U.S. 206, 209 (2001) (citing 26 U.S.C. § 1366). For purposes of determining who is a shareholder in an S-Corporation, beneficial ownership, not technical legal title, is controlling. United States v. Pirro, 212 F.3d 86, 103 (2d Cir. 2000) (McLaughlin, J., dissenting) (citing Danenberg v. Comm'r, 73 T.C. 370, 390, 1979 WL 3864 (1979); Ragghianti v. Comm'r, 71 T.C. 346, 349, 1978 WL 3361 (1978)).

Ms. Bonilla argues that summary judgment in her favor is warranted because she has met her burden of showing that she overpaid her taxes. See Bonilla Reply in Supp. at 2. Her argument rests on her claim that there is no genuine dispute of material fact that Ms. Bonilla was not a record or beneficial owner of BBI during the tax years in question. See id. at 2–3, 9–10. The government argues that summary judgment in its favor is warranted because there is no genuine dispute of material fact that Ms. Bonilla was a beneficial owner of BBI during the tax years in question. See USA Mem. in Supp. at 7m 19–20. Therefore, determining whether a genuine issue of material fact exists as

to whether Ms. Bonilla was a beneficial owner of BBI during the relevant tax years resolves both parties' Motions for Summary Judgment.

If there is no genuine dispute of material fact that Ms. Bonilla was a beneficial owner of BBI, then she was legally required to report her pro-rata share of BBI's income on her personal taxes for the 2010 and 2011 tax years, the government's Motion for Summary Judgment must be granted, and Ms. Bonilla's Motion for Summary Judgment must be denied. If, on the other hand, there is no genuine dispute of material fact that Ms. Bonilla did not own BBI during the relevant tax years, the government's Motion must be denied, and Ms. Bonilla's Motion must be granted.[8]

In <u>Dunne v. Comm'r</u>, No. 24666-05, 2008 Tax Ct. Memo LEXIS 63 (T.C. Mar. 12, 2008), the Tax Court addressed the question of whether an agreement that does not transfer legal title nonetheless transfers beneficial ownership between two parties. <u>Id.</u> at *28. The Tax Court noted that, in determining whether beneficial ownership had been transferred, a court must look to "at all of the facts and circumstances surrounding the transfer, relying on objective evidence of the parties' intentions provided by their overt acts." <u>Id.</u> The Tax Court provided a list of factors it had, in the past, found relevant to identifying a beneficial owner. <u>See</u> <u>id.</u> at 29–30.

The government argues that application of the <u>Dunne</u> factors to this case demonstrates that there is no genuine issue of material fact as to whether Ms. Bonilla was a beneficial owner of BBI in 2010 and 2011. U.S. Mem. in Supp. at 19–20.

---

[8] Of course, on cross-motions for summary judgment, the court is not required to grant judgment as a matter of law for either side. <u>See</u> <u>Ricci v. DeStafano</u>, 530 F.3d at 109–10. Here, if a genuine dispute of material fact exists as to <u>whether or not</u> Ms. Bonilla owned BBI during the relevant tax years, both parties' Motions for Summary Judgment would be denied.

However, the government conceded at oral argument that the Dunne factors did not neatly apply to the current case. Ms. Bonilla argues that (1) no Second Circuit case has cited to the Dunne factors in analyzing beneficial ownership of stock and this court therefore need not rely on Dunne, and (2) even if the court applies the Dunne factors, it is "clear that Ms. Bonilla was not a beneficial owner of BBI in the 2010 and 2011 tax years." Reply in Supp. at 9–10; Bonilla Mem. in Opp. at 24–25.

The court agrees that it is not bound by Dunne. While federal law establishes the type of ownership interest from which tax liability flows—here beneficial ownership, not legal title—whether a taxpayer has such an interest is a question of state law. See Pahl v. Comm'r, 150 F.3d 1124, 1128 (9th Cir. 1998) ("[C]ourts look to the tax statutes and interpreting cases to determine what interest is sufficient to trigger tax liability, and to state law to determine whether the taxpayer had such an interest."); Cabintaxi Corp. v. Comm'r, 63 F.3d 614, 617 (7th Cir. 1995) ("[F]ederal law . . . determines which kind of shareholder—namely, beneficial rather than record—is required . . . . Whether a particular investor was a shareholder of that kind . . . is an issue of state law.") (emphasis in original).

Although neither party provided this court with briefing on applicable state law, the court raised this issue at oral argument. Where, as here, jurisdiction is asserted based on the existence of a federal question, courts are "directed to apply a federal common law choice of law rule to determine which jurisdiction's substantive law should apply." Wells Fargo Asia Ltd. v. Citibank, N.A., 936 F.2d 723, 726 (2d Cir. 1991); see also Corporacion Venezolana de Fomento v. Vintero Sales Corp., 629 F.2d 786, 795 (2d Cir. 1980). Generally, the federal common law choice of law rule is to apply "the law

of the jurisdiction having the greatest interest in the litigation." Eli Lilly do Brasil, Ltda v. Fed. Express Corp., 502 F.3d 78, 81 (2d Cir. 2007). Given that the Divorce Decree, the December 2010 Hearing, the dissolution of Ms. Bonilla and Mr. Bonilla's marriage, and the equitable distribution of marital property, including BBI, took place in Connecticut, the court concludes that Connecticut maintains the greatest interest in the litigation.

Under Connecticut law, a court presiding over a dissolution of marriage "may assign to either spouse all or any part of the estate of the other spouse." Conn. Gen. Stat. § 46b-81. It is undisputed in this case that the state court, in its May 22, 2009 Divorce Decree, ordered that BBI was to be "divided equally by the parties within thirty (30) days from the date of [the] Decree." U.S. Mot. Summ. J., Ex. 1 (Doc. No. 31-1) ("May 2009 Divorce Decree") at 15. After the expiration of 30 days, by operation of law, Ms. Bonilla had an enforceable interest in a 50 percent ownership of BBI. See supra at 11. Therefore, this court finds that there is no genuine issue of material fact that, following the expiration of the 30th day after the May 2009 Divorce Decree, Ms. Bonilla was the beneficial owner of 50 percent of BBI.

It is undisputed that the parties entered into a stipulated oral agreement before the same state court in December 2010. At the December 2010 Hearing, the parties agreed that Ms. Bonilla would become the sole owner of BBI, and that the burden would be on Ms. Bonilla's attorneys to carry out the paperwork required to effectuate the transfer. See Dec. 2010 Tr. at 13:16. The court so ordered the agreement. Id. at 26:24. Notwithstanding the undisputed fact that expected paperwork was never signed, and that Ms. Bonilla never received legal title to BBI's shares, the parties entered into an enforceable agreement, later incorporated into a court order, that separated their

marital property and resolved all outstanding issues in the divorce. Ms. Bonilla, as a matter of Connecticut law, had an enforceable, beneficial interest in the full ownership of BBI, as of December 14, 2010.

To the extent that beneficial ownership of a Florida corporation is defined by Florida law, the court notes that Florida courts have held that one may be a beneficial owner of stock, notwithstanding the lack of legal title to the same. See Smallwood v. Moretti, 128 So. 2d 628, 629 (Fla. Dist. Ct. App. 1961) ("[I]t is possible under some circumstances for one to own stock in a corporation though no certificate has been issued to him."); Phillips v. Zimring, 284 So. 2d 233, 235 (Fla. Dist. Ct. App. 1973) (concluding that U.C.C.'s requirement for delivery of a stock certificate "involves the legal title only and does not embrace the broad field of equitable rights and interests and the methods of their transfer."); Acoustic Innovations, Inc. v. Schafer, 976 So. 2d 1139, 1145 (Fla. Dist. Ct. App. 2008) (holding that "strict record ownership is not a prerequisite for the holders of equitable or beneficial interests in shares of stock to have standing to sue."). Ms. Bonilla's interest in BBI was therefore not only enforceable in Connecticut, but also in Florida, where BBI was formed.

As to the effect of the Connecticut court's decision in Florida, Florida courts have a longstanding history of affording divorce decisions in other states preclusive effect under the principle of comity and the constitutional requirement of full faith and credit. See, e.g., Kelley v. Kelley, 147 So. 3d 597, 601–02 (Fla. Dist. Ct. App. 2014) ("Consistent with full faith and credit, a divorce decree obtained in a foreign state is impeachable in Florida only if the judgment is susceptible to collateral attack under the foreign state's jurisprudence"); id. at 602 ("[W]here there has been participation by the

[parties] in the divorce proceedings and the [parties] ha[ve] been accorded full opportunity to contest the jurisdictional issues, any further attack on the judgment is barred by res judicata."); Barnett v. Barnett, 787 So. 2d 946, 946 (Fla. Dist. Ct. App. 2001) (holding that where Tennessee court had entered judgment of divorce one year earlier; Florida court should have given full faith and credit to the Tennessee judgment).

The beneficial owner of shares in an S Corporation is liable for the taxes owed on her pro rata share of the corporation's income, regardless of whether distributions are made. See 26 C.F.R. § 1.1366-1(a). Here, there is no genuine issue of material fact that the Connecticut divorce vested beneficial ownership of BBI in Ms. Bonilla, as to half of the company, at least 30 days following the 2009 Divorce Decree and, as to all of the company following the December 2010 Hearing. Ms. Bonilla is therefore responsible for the taxes owed on her pro rata share of BBI's income in the 2010 and 2011 tax years.[9]

Because there is no genuine issue of material fact that (1) Ms. Bonilla was a beneficial owner of BBI during the relevant tax periods, and (2) that beneficial ownership in an S Corporation is controlling for tax purposes, there is no genuine issue of material fact that Ms. Bonilla owed the taxes the IRS assessed. Ms. Bonilla's Motion for Summary Judgment is denied, and the government's Motion for Summary Judgment is granted.

---

[9] As noted, see supra at 6, the government conceded, on April 4, 2018, that $372,023 of the $780,393 increase to Ms. Bonilla's income for the 2010 tax year was incorrect and directed the IRS to partially abate the tax, penalties, and fees levied against Ms. Bonilla. Ms. Bonilla is therefore not liable for any amount due under the conceded, improperly calculated portion of her 2010 taxes.

## IV.    CONCLUSION

For the foregoing reasons, Ms. Bonilla's Motion for Summary Judgment (Doc.

No. 29) is denied, and the government's Motion for Summary Judgment (Doc. No. 30) is

granted.  The Clerk is ordered to close this case.


**SO ORDERED.**

Dated at New Haven, Connecticut this 22nd day of March 2019.


/s/ Janet C. Hall_____
Janet C. Hall
United States District Judge
